EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAÚL FIGUEROA GARCÍA, acusado y apelante.

Número: CR-64-130     Resuelto: 8 de febrero de 1965

*Santos P. Amadeo,* y *Guillermo Bird,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *J. F. Rodríguez Rivera, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

El Juez Asociado Señor Pérez Pimentel emitió la opinión del Tribunal.

En la noche del 16 al 17 de junio de 1960 una máquina que arrastraba vagones de cañas por la vía de ferrocarril que discurre entre Ceiba y Fajardo, arrolló a un hombre destrozándole el cráneo. Esa persona resultó ser Francisco Rosario Matta. Antes de ser arrollado por la máquina su cuerpo estaba inmóvil tendido en el suelo, descansando la cabeza sobre uno de los raíles y el resto del cuerpo fuera de la vía, en forma perpendicular a ésta. A pesar de que en el sitio se recogieron fragmentos separados de huesos de la cavidad craníana y parte de la masa encefálica, se notó allí la presencia de muy poca sangre. (¹)

---

(¹) El médico que practicó la autopsia en el cadáver de Francisco Rosario Matta llegó a la conclusión de que la muerte se debió a traumatismo cráneo encefálico que provocaron fracturas conminutas de la "bóveda y base por estallamiento con atrición y pérdida de substancia del cerebro". Testificó además el médico que el cadáver presentaba en la parte derecha del tórax fracturas a nivel de la línea media clavicular de las cinco primeras costillas; que estas fracturas habían perforado la pleura parietal y que "por efecto de esas perforaciones pleurales había sangre de los pequeños vasos de esta cerosa que cubre el hemitórax"; que de haberse producido la muerte por estallamiento no hubiese sangrado como sangró porque tan pronto la persona muere cesa la hemorragia; que en este caso al producirse la fractura de las costillas y la perforación de la pleura, la herida fue sangrando lentamente y que vivió algún tiempo como para sangrar la cantidad de sangre que se encontró en el hemitórax derecho.

Del récord se deduce que al maquinista Martín Rosario Corsino se le iba a procesar por un delito de homicidio involuntario. (²) A solicitud del Fiscal, la detective se hizo cargo de la investigación de la muerte de Rosario Matta y como resultado de ella, se acusó al aquí apelante Raúl Figueroa García de un delito de Asesinato consistente en haber dado muerte ilegal a Francisco Rosario Matta acometiéndole y agrediéndole con un tubo de hierro, produciéndole heridas que le causaron la muerte.

El jurado que entendió en su causa lo declaró culpable de Asesinato en Segundo Grado y fue condenado a la pena de 10 a 20 años de presidio.

En este recurso de apelación señala la comisión de los siguientes errores:

"*Primer Error:* La corte sentenciadora erró al admitir la confesión escrita del acusado, hecha ante el fiscal, porque de la faz del documento surge que no se le advirtió al apelante del derecho a no incriminarse y del derecho a tener asistencia de abogado antes de confesar.

*Segundo Error:* La corte sentenciadora erró al admitir la confesión escrita del acusado, hecha ante el fiscal, porque siendo ésta la investigación fiscal una etapa del procedimiento, el acusado tenía derecho constitucional a asistencia de abogado de acuerdo con la doctrina establecida por el Tribunal Supremo en el caso de *White* v. *Maryland,* 373 US pág. 59.

*Tercer Error:* La corte sentenciadora erró al admitir la confesión escrita del acusado, hecha ante el fiscal, porque, aún asumiendo que el acusado no tuviera derecho constitucional absoluto a asistencia de abogado bajo la doctrina del caso de *White* v. *Maryland,* supra, sin embargo este tiene derecho a asistencia de abogado de acuerdo con los casos de *Crooker* v. *California,* 357 US 433, y el caso de *Escobedo* v. *Illinois,* resuelto por el Tribunal Supremo de Estados Unidos el 22 de junio de 1964.

*Cuarto Error:* La corte sentenciadora erró al admitir la de-

---

(²) Algunos testigos declararon que el maquinista estaba acusado de homicidio involuntario pero del récord no aparece que se librara orden de arresto contra él o se le formulara acusación.

claración del testigo Martín Rosario Corcino en la cual relataba la confesión oral que le había hecho el acusado.

*Quinto Error:* La corte sentenciadora erró al no resolver que la confesión del acusado era involuntaria como cuestión de hecho y de derecho, y haber sometido al jurado para que éste determinara la voluntariedad de dicha confesión como una cuestión de hecho."

■ Ninguno de los fundamentos aducidos en los tres primeros errores hacían inadmisible en evidencia la confesión escrita del acusado hecha ante el Fiscal. De la faz del propio documento (confesión) surge que el apelante declaró "previas las advertencias de ley, que me han sido hechas, . . ." y aunque dicho apelante declaró durante el juicio sobre el carácter involuntario de su confesión no alegó ni intentó probar que el Fiscal al momento de tomar por escrito su confesión no le hiciera las advertencias de ley.

Por otro lado, los hechos del presente caso no justifican la aplicación de las doctrinas establecidas en *White* v. *Maryland,* 373 U.S. 59; *Crooker* v. *California,* 357 U.S. 433 y *Escobedo* v. *Illinois,* resuelto por el Tribunal Supremo de los Estados Unidos en 22 de junio de 1964, en lo que respecta a la admisibilidad de la confesión. Veamos.

En *White* v. *Maryland,* el acusado hizo alegación de culpabilidad, sin asistencia de abogado en la vista preliminar celebrada ante un magistrado, y luego en el juicio se presentó en evidencia dicha alegación de culpabilidad. Comentando este caso, dijimos en *Soto Ramos* v. *Supert. Granja Penal,* 90 D.P.R. 731 (1964), lo siguiente: "El Tribunal Supremo de los Estados Unidos resolvió que al igual que en *Hamilton* v. *Alabama,* 368 U.S. 52, esa etapa del procedimiento en Maryland era tan crítica o peligrosa como lo era el acto de la lectura de acusación en Alabama, y revocó el fallo."

El caso de *Crooker* v. *California,* 357 U.S. 433, 2 L.Ed.2d 1448; lo comentamos en el de *Rivera Escuté* v. *Delgado,* 80 D.P.R. 830 (1958). Después de analizar la opinión en el caso

de *In re Groban,* 352 U.S. 330, dijimos a la página 851 y siguientes:

" . . . No mucho después, en el caso de *Crooker* v. *California,* 357 U.S. 433, 2 L.ed. 2d 1448, que fue resuelto en 30 de junio de 1958 ya radicada la petición de hábeas corpus y el día en que expedimos el auto, en opinión de una mayoría de la cual formaron parte los Jueces Frankfurter y Harlan el Tribunal Supremo resolvió que una confesión dada por el allí acusado mientras era sometido a interrogatorio por agentes policíacos no estaba viciada de coacción e involuntariedad a la luz de todas las circunstancias y demás factores presentes, pasando por primera vez sobre la naturaleza coercitiva o involuntaria de una confesión obtenida después de negársele al acusado su petición expresa de consultar abogado en esa etapa investigadora.

Debido a las serias implicaciones de debido procedimiento de ley que surgen al negarse por el Estado una petición para emplear abogado, expresa la opinión, se expidió *certiorari.* (357 U.S. 434.)

Se concluyó, en primer término, *que el mero hecho* de una detención e interrogatorio de la policía en privado a una persona bajo custodia oficial no hacía la confesión involuntaria, así como tampoco el hecho de que se violaran disposiciones estatutarias locales sobre el deber de conducir al detenido prontamente ante un magistrado. *Brown* v. *Allen,* 344 U.S. 443 (1953); *Fikes* v. *Alabama,* 352 U.S. 191 (1957). Resulta, por tanto, que nuestro sistema acusatorio de investigación en privado no cae, *per se,* al margen del debido procedimiento. Dispuesto lo anterior, el Tribunal Supremo sostuvo entonces que la contención del acusado en cuanto a coacción descansaba en la negativa a su petición para consultar abogado, y tal contención fue igualmente rechazada citándose *Brown v. Allen,* 344 U.S. 443 (1953); *Stroble* v. *California,* 343 U.S. 181 (1952) *Gallegos* v. *Nebraska,* 342 U.S. 55 (1951), en donde se había sostenido que confesiones de acusados indigentes hechas antes de nombrárseles abogado por el Estado no eran por tal motivo involuntarias, aun en aquellos procesos en que una convicción sin abogado violaría el debido procedimiento de la Enmienda XIV.

Pasando al argumento de que aun cuando la confesión fuera voluntaria, su *uso* violaba el debido procedimiento por haberse obtenido la misma después de una negativa a la petición del acusado para consultar abogado ya que esto le privaba del derecho

constitucional a representación y consejo legal, y por la tanto viciaba en sí misma la confesión por falta del debido procedimiento aunque voluntariamente hecha, el Tribunal también rechazó el argumento. Reafirmando que la asistencia de abogado garantizada en los procesos estatales por el debido procedimiento de ley de la Enmienda XIV no sólo incluía el derecho a nombramiento de abogado en ciertos casos, sino también el derecho de un acusado a una razonable oportunidad para obtenerlo de su propia selección, dijo la mayoría: (357 U.S. pág. 439.)

'Bajo estos principios, *la negativa del estado a una petición para emplear abogado* viola el debido procedimiento no sólo si se priva al acusado de abogado en el juicio en los méritos, *Chandler* v. *Fretag,* supra, sino también si se le priva de abogado en cualquier parte de los procedimientos anteriores al juicio, *siempre que se le perjudique de tal manera, que dicha privación imprima su juicio posterior con la carencia de 'aquella fundamental imparcialidad esencial al concepto mismo de justicia'.* [citas] Esta última determinación depende necesariamente *de todas las circunstancias del caso.'* [Énfasis adicionado.]

Ante todas las circunstancias del caso,—una confesión voluntariamente dada por un acusado con educación de colegio quien había asistido un año a una escuela de derecho y que conocía su derecho a permanecer callado—se concluyó finalmente que a Crooker no se le había creado tal situación de perjuicio ni se había tomado ventaja de él en forma tal como para entenderse violado su derecho al debido procedimiento.

De nuevo, en *Cicenia* v. *Lagay,* 357 U.S. 504, 2 L.ed. 1523, resuelto en igual fecha que *Crooker,* el Tribunal Supremo afrontó similar contención a la luz del hecho de que en este caso el acusado solicitó durante la investigación, y se le negó, el consultar con un abogado ya contratado por él. Distinto a Crooker él admitió la voluntariedad de su confesión, pero sostenía que la misma estaba viciada por la negativa de la policía a permitirle asesorarse con su abogado durante la detención en el cuartel, y que esto de por sí violaba el debido procedimiento independientemente de las particulares circunstancias envueltas. El Tribunal rechazó una vez más el argumento de que el acusado tenía un derecho constitucional bajo la Enmienda XIV a consultar con un abogado en esa etapa investigadora, *Crooker, supra.* Estableciendo el equilibrio propio que debe regir entre el fundamental derecho a asistencia legal en casos criminales, de un lado, y la

obligación de las autoridades policiacas de perseguir el crimen, del otro, expresó el Juez Harlan hablando por la mayoría que la fórmula de conciliación entre esos dos imperativos encontrados no ha de ser un pronunciamiento abarcador de que uno debe ceder al otro, sino que al decidirse si una convicción estatal cumple los requisitos del debido procedimiento, se ha buscado el adecuado ajuste o acomodo, considerándose la falta de abogado un factor pertinente al determinarse, de entre todas las circunstancias, si la convicción fue resultado de una fundamental injusticia." (80 D.P.R. págs. 851 a 855.)

En *Escobedo* v. *Illinois*, 378 U.S. 478, 12 L.Ed.2d 977, el punto crítico a resolver era si bajo las circunstancias la negativa de la policía a honrar la petición del acusado para consultar con su abogado durante el curso de su interrogatorio constituía una negación de la "Asistencia de Abogado" en violación de la Enmienda Sexta de la Constitución hecha obligatoria para los Estados por la Enmienda Catorce.

Escobedo fue detenido por la muerte de su cuñado. Mediante un recurso de hábeas corpus fue puesto en libertad. Al descubrirse nueva evidencia incriminatoria en su contra fue nuevamente arrestado y conducido esposado al cuartel de la policía. En el trayecto, al ser interrogado por la policía, manifestó su deseo de entrevistarse con su abogado. Poco después de estar en el cuartel llegó allí su abogado. Éste trató infructuosamente por todos los medios de entrevistarse con el detenido quien a su vez solicitó sin éxito entrevistarse con dicho abogado.

Durante el interrogatorio, Escobedo fue confrontado con un tal Di Gerlando quien era la persona que le acusaba de haber hecho los disparos fatales. Por primera vez Escobedo admitió tener conocimiento del crimen al acusar a Di Gerlando de haber disparado contra la víctima Manuel. Después de eso hizo otras manifestaciones complicándose en el crimen. Durante todo el interrogatorio no se advirtió a Escobedo de sus derechos constitucionales.

■ Al revocar la sentencia de la Corte Suprema de Illinois, el Tribunal Supremo de los Estados Unidos, sentó la siguiente doctrina:

" . . . cuando, como en ese caso, la investigación deja de ser ya la pesquisa general de un crimen aún no aclarado, sino que empieza a enfilarse sobre un sospechoso en particular y ese sospechoso está bajo la custodia policíaca, y se le interroga para sacarle declaraciones incriminatorias, y el sospechoso ha solicitado y se le ha negado la oportunidad de consultar con abogado, y la policía no le ha advertido de manera efectiva de su derecho constitucional 'absoluto' de permanecer en silencio, al acusado se le ha negado la asistencia de abogado y ninguna declaración así obtenida puede usarse en su contra por el Estado en un juicio criminal." (Informe del Procurador General, pág. 3.)

■ Ya dijimos antes que aunque al principio se consideró al maquinista Martín Rosario Corsino autor de un delito de homicidio involuntario, la detective continuó investigando la muerte de Francisco Rosario Matta, a instancias del Fiscal. Se trasladaron a las parcelas Aguas Claras de Ceiba donde vivía el interfecto Rosario Matta y allí interrogaron a la viuda de éste, Lin García, quien les declaró que el día 16 de junio de 1960, desde la una de la tarde estuvieron tomando licor en su casa su esposo Rosario Matta, un hermano de ella llamado Heriberto García y Raúl Figueroa; (³) que luego se fueron, siendo su esposo el último en irse y que después de esa noche no volvió a verlo vivo. En vista de esa información la detective se dirigió a la casa del apelante en las mismas parcelas y lo detuvieron como a las 11 A.M. para interrogarlo. Lo trasladaron al cuartel de la policía de Humacao y allí por vez primera confesó oralmente su participación en la muerte del occiso Rosario Matta. Luego repitió su confesión en Fajardo ante el maquinista Martín Rosario Corsino y por la noche de ese mismo día confesó por escrito ante el Fiscal de Humacao. De suerte que cuando el apelante fue interrogado en el cuartel de

---

(³) De la confesión del apelante y del testimonio de un detective surge que también estaba en el grupo Miguel Encarnación Ribot (a) Cabo.

la policía de Humacao y se produjo su confesión oral, el único hecho conocido por la detective hasta ese momento que pudiera relacionar al acusado con el occiso Rosario Matta en época cercana al crimen, era que habían estado juntos la tarde anterior tomando licor. Hasta ese momento la detective practicaba una investigación general para determinar si la muerte de Rosario Matta había sido un accidente, como aparentaba ser, o si se trataba de un asesinato, y no se enfilaba contra el apelante ni contra ninguna otra persona como sospechosa de la comisión de un crimen.

Consideradas todas las circunstancias que concurren en el presente caso la falta de asistencia de abogado al producirse la confesión extrajudicial del acusado no anula el proceso en que se utilizó porque (a) dicha confesión no se produjo en una etapa crítica del procedimiento como en el caso de *White*, antes; (4) (b) el Estado no negó petición alguna del acusado para emplear abogado y la falta de asistencia de abogado en los procedimientos (léase investigación privada) anteriores al juicio no le perjudicaron de tal manera que dicha falta de asistencia de abogado imprimiera a su juicio posterior con "la carencia de aquella fundamental imparcialidad esencial al concepto mismo de la justicia", (5) y (c) los hechos de este caso se distinguen fundamentalmente de los hechos en el caso de *Escobedo*, supra, según apuntamos anteriormente.

El apelante hace girar su argumentación en torno a la confesión escrita hecha ante el Fiscal. Arguye que ésa era una etapa crítica del procedimiento y que para ese momento la pesquisa se enfilaba sobre el acusado como sospechoso, por lo que considera que tenía el derecho constitucional a asistencia de abogado.

Sin embargo, aun suponiendo, sin resolverlo que el apelante tuviera razón en este planteamiento, lo cierto es que la con-

---

(4) Véase *Rivera Escuté*, supra.

(5) *Crooker* v. *California*, supra.

fesión no se produjo en esa etapa de la investigación. El acusado confesó primero en el cuartel de la policía de Humacao y luego en Fajardo cuando hizo un relato espontáneo del crimen ante el maquinista Martín Rosario Corsino. Esas dos confesiones son iguales a la confesión escrita ante el Fiscal. Ningún hecho nuevo incriminatorio agregó a su confesión ante el Fiscal.

En vista de todas estas circunstancias es que hemos considerado inaplicables las doctrinas jurisprudenciales invocadas por el apelante.

■ El cuarto señalamiento es frívolo. Nuestro procedimiento criminal no obliga al Fiscal a tomar declaraciones juradas por escrito a los testigos durante el período interrogatorio, a fin de que se consideren testigos hábiles durante el proceso, aun cuando tales testigos depongan sobre una confesión oral del acusado.

Ahora bien, siguiendo el procedimiento que señalamos en *Pueblo* v. *Declet*, 65 D.P.R. 23 (1945), para la admisión en evidencia de una confesión extrajudicial del acusado, el Fiscal presentó prueba, en ausencia del jurado, para establecer el carácter voluntario de la confesión del acusado-apelante. Éste a su vez presentó prueba para controvertir la de cargo sobre ese aspecto. Una vez recibida esa prueba el juez resolvió, como cuestión de derecho, que la confesión era voluntaria. El jurado entonces oyó la misma prueba sobre si la confesión era o no voluntaria, y en sus instrucciones el Juez les dijo:

"Para que una declaración, una confesión sea admitida y considerada por el Tribunal, es necesario que se demuestre ante el Jurado por manifestaciones hechas de que dicha confesión fue necesaria, que fue hecha voluntariamente, que la hizo de su propia voluntad, que no fue obligado en forma alguna para declarar y si se demuestra que esa es la situación, que el acusado no fue obligado a declarar, entonces, la confesión debe tomarse en consideración para rendir su veredicto.

"Yo deseo recordarles a Uds. que Uds. habrán visto que estuvimos en receso porque al principio, para la confesión ser

admitida, se pasa la prueba primero y la vemos en ausencia de Uds. Entonces, después fue que Uds. volvieron a oirla y se repitió de nuevo la misma declaración. De manera que Uds. tienen ahora que determinar si esa confesión que se ha presentado en evidencia fue voluntariamente y que el acusado en forma alguna, ni por la policía ni por ningún empleado fue obligado a declarar en la forma que lo ha hecho." (T.E. págs. 184 a 185.)

Este procedimiento, mediante el cual el Jurado y no el Juez, resuelve la controversia de hechos respecto a la voluntariedad de confesiones ofrecidas en contra de las personas acusadas de delitos, es similar al procedimiento usado en el Estado de Nueva York. En *Stein* v. *New York*, 346 U.S. 156, 97 L.Ed. 1522, se sostuvo la constitucionalidad de este procedimiento, pero en el reciente caso de *Jackson* v. *Denno*, 378 U.S. 368, 12 L.Ed.2d 908 (1964), se revocó el de *Stein*, sosteniéndose por el Tribunal Supremo Nacional que la regla de Nueva York violaba la cláusula del debido procedimiento de ley de la Enmienda Catorce de la Constitución de los Estados Unidos que protege al acusado contra el uso de confesiones involuntarias.[6] Esta decisión, nos obliga ya bajo la Enmienda Catorce de la Constitución de los Estados Unidos o bajo las disposiciones de la Carta de Derechos de nuestra propia Constitución, donde adoptamos el concepto constitucional norteamericano del "debido proceso de Ley".[7]

■ *Debemos por lo tanto resolver que correspondía al juez y no al jurado resolver la controversia de hecho respecto a la voluntariedad de la confesión del acusado, dentro de las exigencias constitucionales del debido proceso de ley. En su consecuencia se ordenará la celebración de una vista para que el juez decida si la confesión hecha por el apelante es ad-*

---

[6] Para conformar nuestro procedimiento a la decisión en el caso de *Denno*, este Tribunal aprobó en 30 de junio de 1964, la Regla Núm. 151.1 de Procedimiento Criminal, y de acuerdo con nuestras disposiciones constitucionales la sometió en enero de este año a la Asamblea Legislativa.

[7] Véase Informe de la Comisión de la Carta de Derechos, Tomo 4 *Diario de Sesiones de la Convención Constituyente*, pág. 2565.

*misible como cuestión de derecho y de hecho. De resolver lo contrario, deberá ordenar la celebración de un nuevo juicio. Si resolviere a favor de la admisibilidad de la confesión, el veredicto y la sentencia deberán persistir.*

